## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GASPLUS, L.L.C., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 03-1902 (RMC) |
| | ) |
| UNITED STATES DEPARTMENT OF | ) |
| THE INTERIOR, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## MEMORANDUM OPINION

Before the Court are cross-motions for summary judgment filed by Plaintiff GasPlus, L.L.C. and Defendants Department of the Interior ("DOI") and the Bureau of Indian Affairs ("BIA"). The fundamental question in this lawsuit is whether a contract between GasPlus and the Nambe Pueblo Indian Tribe was subject to the requirements of 25 U.S.C. § 81 ("Section 81"), thereby requiring BIA's approval. BIA concluded that it was and, because approval was never obtained, voided the contract. GasPlus argues that this decision was incorrect as a matter of law and that, in the process of reaching that decision, Defendants violated its constitutional due-process rights. The Court agrees with GasPlus that Section 81 was inapplicable to the contract and will therefore grant GasPlus's summary judgment motion on that basis.

### I.  FACTUAL BACKGROUND

The following facts are contained in the Administrative Record (A.R.), the Supplemental Administrative Record (Supp. A.R.), and the Court's prior decisions in this matter. "Under former New Mexico law, bulk distributors of gasoline could avoid the state's excise tax by selling their gasoline to a Registered Indian Tribal Distributor and then buying the gasoline back at

a slightly higher price.  This feature of the tax law provided New Mexico's Indian tribes with an obvious business opportunity. "  *GasPlus, L.L.C. v. U.S. Dep't of Interior*, 466 F. Supp. 2d 43, 44 (D.D.C. 2006).  The Nambe Pueblo is a federally recognized Indian tribe that owns a gasoline distribution business located in Santa Fe County, New Mexico.  A.R. 379.  The Nambe Pueblo Development Corporation ("NPDC") is a federally chartered corporation that the Nambe Pueblo tribe created in order to operate the gasoline distribution business which, because it is located on tribal land, could take advantage of New Mexico's special tax law regarding the distribution of gasoline by Indian tribes.  *Id.*  GasPlus is a New Mexico limited liability company engaged in the business of managing gasoline distribution businesses.  A.R. 103.

On January 4, 2001, GasPlus and the Nambe Pueblo signed a Management Agreement under which GasPlus agreed to "manage, supervise, and operate [Nambe Pueblo's] Gasoline Distribution Business." *Id.*[1]  Under the Management Agreement, GasPlus took on the following duties, among others:

- "Supervise and direct the general operations of" the gasoline distribution business

- "Select and train personnel to run the daily operations" of the business

- "Negotiate prices and coordinate deliveries of [g]asoline"

- "Develop policies for the purpose of maximizing net income"

- "Maintain proper and suitable records and books of account"

- "Bill and collect revenues and fees from sales of branded and unbranded [g]asoline"

- "Pay or cause to be paid out of [Nambe Pueblo's] funds operating expenses"

---

[1]  The Management Agreement was signed at a time when NPDC did not yet have a board of directors, so the Nambe Pueblo Tribe executed the Agreement on behalf of NPDC.  The Tribe later transferred the Management Agreement to NPDC.  *See* A.R. 119.

- "Market, promote, and advertise" the distribution business

- "Supervise and pay, out of [Nambe Pueblo's] funds, construction . . . to build or expand the" business

- "Maintain books and records for the" business

- "[P]repare and file with the appropriate authorities on behalf of [Nambe Pueblo] monthly reports"

- "Prepare annual operating and capital expenditure budgets"

A.R. 103-105.  The Management Agreement further required GasPlus to "regularly consult with [Nambe Pueblo's] Board . . . with respect to GasPlus's conduct of the Gasoline Distribution Business" and, "at least monthly, prepare and provide to the [Nambe Pueblo's] Board a brief written report summarizing the activity of the Gasoline Distribution Business."  A.R. 106.

As consideration for managing the business, GasPlus would receive "a management fee . . . equal to 30% of [the Gasoline Distribution Business's] 'Net Income' for each calendar year." *Id.*  The term of the Management Agreement was five years, and GasPlus had the option to renew the Agreement for two additional five-year terms.  A.R. 107.  David Perez, then-Governor of the Nambe Pueblo, signed the Management Agreement, as did four members of the tribal counsel, on behalf of the Nambe Pueblo; Delese Dellios signed on behalf of GasPlus.  A.R. 112.  The Management Agreement does not mention the real property on which the Nambe Pueblo's distribution business is located, other than to note in the recitals that the business is located in Santa Fe County, New Mexico.  A.R. 103.

In late 2001 or early 2002 Tom Talache Jr., the newly elected Governor of the Nambe Pueblo, contacted the BIA and asked it to review the Management Agreement under Section 81. Pl.'s Facts ¶ H (citing Defendants' Answer ¶ 17).  On February 7, 2002, Robert D. Baracker, who

was BIA's Southwest Regional Director, issued a letter to Governor Talache and Ms. Dellios indicating that he had reviewed the Management Agreement and was declaring it invalid under Section 81 because, in his view, it gave GasPlus "nearly exclusive proprietary control over tribal lands." A.R. 82-84. Mr. Baracker concluded the letter by "demand[ing]" that GasPlus (1) immediately vacate the premises of NPDC's terminal facility; (2) immediately contact the Nambe Pueblo to transfer books and records; and (3) disgorge all proceeds it had received under the Management Agreement. A.R. 83-84. GasPlus received no prior notice that the BIA was reviewing the Management Agreement and had no opportunity to submit any materials for Mr. Baracker's consideration. Pl.'s Facts ¶ L. Nonetheless, the letter from BIA stated that Mr. Baracker's decision was "final and hereby made immediately effective under 25 C.F.R. § 2.6(a) in order to protect the tribal trust resources." A.R. 84. On February 11, 2002, in reliance on Mr. Baracker's letter, the Nambe Pueblo issued an Ex Parte Custody and Temporary Restraining Order to obtain custody of any records developed by GasPlus relating to the Management Agreement and to prevent GasPlus from withdrawing funds from its bank accounts. Supp. A.R. 487-88.

GasPlus immediately appealed Mr. Baracker's decision to the Interior Board of Indian Appeals. A.R. 7-9. Before the Board could hear the appeal, however, the DOI's Acting Assistant Secretary for Indian Affairs, Aurene M. Martin, took jurisdiction over the appeal pursuant to 29 C.F.R. § 2.20(c)(1) and 43 C.F.R. § 4.332(b). *See* A.R. 379. After briefing by GasPlus, the Regional Director's Office, the NPDC, and the Nambe Pueblo, Ms. Martin issued her decision on June 9, 2003. A.R. 379-400. Ms. Martin concluded that under the Management Agreement

> GasPlus has more than a mere financial interest in [the gasoline distribution] business. GasPlus is doing more than just providing services to the Pueblo. Under the terms of the Agreement, the Pueblo cedes all day-to-day operations

and control over its facility to GasPlus. While this level of proprietary control may not be "exclusive" since GasPlus still has reporting obligations to the Pueblo and spending limits, it is so pervasive as to be "nearly exclusive" within the meaning of the regulations and legislative history of Section 81. The Agreement therefore "encumbers" the land within the meaning of Section 81 and the regulations.

A.R. 393. Ms. Martin affirmed Mr. Baracker's decision and further stated that GasPlus was obligated to "take all of the actions ordered in the Regional Director's decision, including . . . vacating the premises, transferring the books and records of the business to Pueblo or NPDC, and returning all proceeds and management fees to the Pueblo or NPDC." A.R. 399.

Three months after Ms. Martin's decision, on September 10, 2003, GasPlus filed this action challenging Ms. Martin's decision under the Administrative Procedures Act, 5 U.S.C. §§ 701-706 ("APA"). In June 2004 GasPlus moved for summary judgment, and in response to that motion Defendants moved to remand the action to the BIA for further consideration of issues raised by GasPlus in its summary judgment motion — namely, whether the remedies imposed by Mr. Baracker and Ms. Martin were authorized by Section 81 and whether GasPlus's due-process rights had been violated during the administrative review process. The Court granted the motion to remand on November 8, 2004. Approximately one year later, on November 21, 2005, the BIA's Associate Deputy Secretary rendered his decision on the remanded issues, concluding that the remedies enumerated in Mr. Baracker's and Ms. Martin's decisions were not authorized by the statute (but that there was no harm to GasPlus because those decisions, in theory, did not actually order GasPlus to take any action) and that GasPlus's due-process rights had not been violated. Supp. A.R. 567-578.

On January 6, 2006, GasPlus filed a second amended complaint in this Court, and on April 29, 2006, GasPlus filed a third amended complaint in which it added *Bivens*[2] claims against Mr. Baracker and Ms. Martin.   On July 10, 2006, Defendants moved to dismiss the *Bivens* allegations on jurisdictional grounds, and on December 8, 2006, the Court granted the motion.   On January 22, 2007, GasPlus and Defendants both filed motions for summary judgment.   Those motions have been fully briefed and are now ripe for decision.

## II.  LEGAL STANDARDS

Under Federal Rule of Civil Procedure 56, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).   Summary judgment is properly granted against a party that "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."   *Celotex*, 477 U.S. at 322.   To determine which facts are "material," a court must look to the substantive law on which each claim rests.   *Anderson*, 477 U.S. at 248.   A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action.   *Celotex*, 477 U.S. at 322.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true.

---

[2]  *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

*Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "[t]he mere existence of a scintilla of evidence" in support of its position.  *Id.* at 252.  Moreover, the nonmoving party may not rely solely on allegations or conclusory statements.  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993).  Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor.  *Greene*, 164 F.3d at 675.  If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).

### III.  ANALYSIS

Does Section 81 apply to the Management Agreement?  That straightforward legal question is at the heart of this lawsuit and will require the Court to examine the language and history of Section 81 — in particular, the circumstances surrounding the amendments to Section 81 in 2000.  Before reaching that question, however, the Court must determine whether GasPlus has standing to seek judicial review of the BIA's decision that Section 81 applies to the Management Agreement.

### A.      GasPlus's Standing Under the APA.

In order to obtain review under the APA, "GasPlus must show both constitutional and prudential standing: injury-in-fact, causation, redressability, and that it is within the zone of interests protected by" Section 81.  Defs.' Mem. of P. & A. In Support of Defs.' Mot. for Summ. J. ("Defs.' Mem.") at 11-12.  Defendants argue that GasPlus cannot make this showing because it "is not within the zone-of-interests for Section 81 because Section 81 was enacted solely for the protection and benefit of Indians."  *Id.* at 12.  GasPlus responds that this Court's December 8, 2006, decision granting Defendants' motion to dismiss held that GasPlus has standing under the APA and, in any

event, that it is within Section 81's zone of interest.  Pl.'s Response to Def.'s Mem. of P. & A. In Support of Defs.' Mot. for Summ. J. at 40-41.

The Court disagrees with GasPlus that the decision on Defendants' motion to dismiss resolved the prudential standing question.  Although that decision concluded that GasPlus cannot state a *Bivens* action against Ms. Martin because it has the ability to challenge her decision under the APA, *GasPlus*, 466 F. Supp. 2d at 50, the issue of GasPlus's prudential standing was not briefed by the parties and was not addressed in the Court's decision.  It is therefore an open question and Defendants are free to raise it now.

Nevertheless, the Court finds no merit to Defendants' assertion that GasPlus lacks standing because it is outside Section 81's "zone of interest."  Defendants reason that Section 81 was passed "solely for the protection and benefit of Indians" and, therefore, GasPlus is outside the statute's zone of interest.  Defs.' Mem. at 12.  That reasoning is contradicted by the relevant authorities, which speak of a *zone* of interest, meaning that prudential standing extends to persons and entities beyond those who are the direct beneficiaries of the legislation: "Even if a particular litigant is outside the class for whose benefit the statute was enacted, that litigant retains prudential standing so long as its interests are sufficiently congruent with those of the intended beneficiaries that the litigants are not more likely to frustrate than to further . . . statutory objectives."  *In re Vitamins Antitrust Class Actions*, 215 F.3d 26, 29 (D.C. Cir. 2000) (internal quotation marks omitted).  Thus, the fact that Section 81 was passed to benefit Indian tribes does not necessarily preclude non-Indians, such as GasPlus, from being within the statute's zone of interest.  The question is whether tribal business partners' interests are sufficiently congruous with the interests of Indian tribes so that they are more likely to further than to frustrate the statute's objectives.  *Id.*

Defendants further argue that Congress passed Section 81 in order "to protect Indian tribes *from* third parties" and, therefore, that GasPlus lacks prudential standing because its interests are inconsistent with the Nambe Pueblo's.  Defs.' Reply In Support of Mot. for Summ. J. ("Defs.' Reply") at 7.  This argument reflects the very sort of paternalistic view towards Indian tribes that motivated Congress to amend Section 81.  *See* S. Rep. 106-150 at 4 (1999).  Far from seeking to protect Indian tribes from third parties, the 2000 amendments to Section 81 were designed to encourage third parties to enter into business relationships with Indian tribes by clarifying and significantly reducing the scope of prior Section 81.  *Id.* at 9.  The amended statute would still require "a limited number of transactions" to be submitted for BIA approval, *id.*, but the overall goal of the amendments was to reduce Government oversight of Indian economic activity.  *See id.*  That a tribe and its business partner may arrive at a dispute over a particular contract, and thereby acquire divergent legal interests, does not mean that tribal business partners' interests are generally inconsistent with the tribes' or with the objectives of Section 81.  Again, the question is whether the interests of tribal business partners are sufficiently congruous with the interests of Indian tribes relative to the objectives of Section 81.  *See Vitamins Antitrust*, 215 F.3d at 29.  Since one key objective of the amended Section 81 is to create incentives (or, perhaps more precisely, to remove a major disincentive) for businesses to contract with Indian tribes, the businesses are within Section 81's zone of interest.  A contrary conclusion would be out of keeping with what Congress dubbed the "Indian Tribal Economic Development and *Contract Encouragement Act* of 2000."  Pub. L. No. 106-179, 114 Stat. 46 (2000) (emphasis added).

Moreover, in addition to covering those entities whose interests Congress intended to protect, the zone-of-interest test also covers entities whose interests Congress intended to regulate.

-9-

*See Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 922 (D.C. Cir. 1989); *see also Building Indus. Ass'n of Superior Cal. v. Babbitt*, 979 F. Supp. 893, 900 (D.D.C. 1997) ("[T]he D.C. Circuit [has] recognized that a party can meet the prudential standing test by qualifying either as a regulated interest or a protected interest."). Entities whose interests are regulated by a statute have prudential standing because they "have the incentive to guard against any administrative attempt to impose a greater burden than that contemplated by Congress." *Thomas*, 885 F.2d at 922. "A party is 'regulated' for purposes of the 'zone' test only if it is regulated by the particular regulatory action being challenged." *Id.* (internal quotation marks omitted). The legislative history of the amendments to Section 81 is replete with reference to tribal business partners, which indicates that Congress knew and intended that the statute would regulate entities like GasPlus. *See generally* S. Rep. 106-150 at 5, 7, 10. And GasPlus's interests were clearly regulated by the BIA's decision to void the Management Agreement. Indeed, GasPlus's basic argument in this lawsuit is that the BIA has imposed a greater burden on GasPlus (and the Nambe Pueblo) than what Congress intended when it amended Section 81. The prudential standing test, which "is not meant to be especially demanding," *Clarke v. Sec. Indus. Assoc.*, 479 U.S. 388, 399 (1987), is therefore satisfied.

The other standing requirements are also satisfied. GasPlus has suffered an injury in fact: namely, the loss of its rights and benefits arising from the Management Agreement. *See, e.g.*, *Idaho Power Co. v. F.E.R.C.*, 312 F.3d 454, 460 (D.C. Cir. 2002) (holding that an agency's interference with a private party's contract rights constitutes an injury in fact). The causation requirement is satisfied because GasPlus's loss of its contract rights was the direct result of the BIA's decision that the Management Agreement was void and unenforceable under Section 81. And that injury can be remedied by an order from this Court declaring that the BIA's decision was erroneous.

Finally, the APA's finality requirement is satisfied because Ms. Martin's decision was final agency action. A.R. 399 ("Because this decision is issued by an Assistant Secretary of the Department of the Interior, it is the final action of the Department and effective immediately, under 25 C.F.R. § 2.20(c).").[3]

### B.    Applicability of Section 81 to the Management Agreement.

We now come to the heart of the matter. Before embarking on a review of the BIA's decisions with respect to the Management Agreement, it is important to understand the ground rules under which this Court must operate. The APA requires a reviewing court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Tourus Records, Inc. v. Drug Enforcement Admin.*, 259 F.3d 731, 736 (D.C. Cir. 2001). In making this inquiry, the reviewing court "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989) (internal quotation marks omitted). At a minimum, the agency must have considered relevant data and articulated an explanation establishing a "rational connection between the facts found and the choice made." *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626 (1986); *see also Pub. Citizen, Inc. v. Fed. Aviation Admin.*, 988 F.2d 186, 197 (D.C. Cir. 1993) ("The requirement that agency action not be arbitrary

---

[3] Defendants argue that Ms. Martin's decision was not final agency action because this Court remanded certain issues to the Agency, which were resolved by an opinion and order issued by the DOI's Associate Deputy. Defs.' Reply at 17-18. But this argument applies only to the issues that were remanded — *i.e.*, GasPlus's due-process claim and its argument that the BIA lacked authority to order disgorgement. As discussed below, the Court need not and does not reach those issues. With respect to the issue that the Court does reach — whether the Management Agreement was subject to Section 81 — Ms. Martin's decision was final agency action and is thus subject to review under the APA.

or capricious includes a requirement that the agency adequately explain its result.").  An agency

action usually is arbitrary or capricious if

> the agency has relied on factors which Congress has not intended it to
> consider, entirely failed to consider an important aspect of the problem,
> offered an explanation for its decision that runs counter to the evidence
> before the agency, or is so implausible that it could not be ascribed to a
> difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S.v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also*

*County of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999) ("Where the agency has

failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the

court] must undo its action.").

As the Supreme Court has explained, "[t]he scope of review under the 'arbitrary and

capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."

*Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  Rather, the agency action under review is "entitled to

a presumption of regularity.  But that presumption is not to shield [the agency's] action from a

thorough, probing, in-depth review."  *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402,

415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

Both Mr. Baracker and Ms. Martin determined that Section 81 applies to the

Management Agreement.  The parties here agree that Section 81 applies to a contract only when

three criteria are met: (1) the contract is with an Indian tribe; (2) the contract encumbers Indian land;

and (3) the contract is for a term of seven years or more.  *See* Defs.' Mem. at 14; Pl.'s Mem. in

Support of Mot. for Summ. J. ("Pl.'s Mem.") at 5.  GasPlus contends that the Management

Agreement was not with an Indian tribe and that the contract was not for a term of seven years or

more.  Pl.'s Mem. at 17-24.  The Court concludes that it need not address those questions, however,

because the Management Agreement clearly does not "encumber Indian land" within the meaning of Section 81.

Section 81 was enacted in 1871 in response to "claims agents and attorneys working on contingency fees who routinely swindled Indians out of their land, accepting it as payment for prosecuting dubious claims against the federal government." *United States ex rel. Steele v. Turn Key Gaming, Inc.*, 260 F.3d 971, 976 (8th Cir. 2001). In its original form, Section 81 required that the Secretary of the Interior approve contracts for "services for . . . Indians relative to their lands." That somewhat cryptic language — "services for Indians relative to their lands" — caused considerable confusion among "Indian tribes, their corporate partners, courts, and the [BIA] [who] struggled for decades with how to apply Section 81." S. Rep. 106-150 at 2; *see also id.* at 5 ("[Under former Section 81] neither tribes, their partners, nor the BIA could predict with any certainty whether a court might ultimately conclude that a transaction was void because it was not approved pursuant to Section 81. The risk that a court might make such a conclusion was exacerbated by severity of the penalty for non-compliance borne by the party contracting with the tribe.").

In 1999 Congress decided to end Section 81's long history of confusing judges, lawyers, Indian tribes, and tribal business partners, and to bring Section 81's antiquated treatment of Indian tribes in line with modern attitudes towards tribal self-determination. *See generally* S. Rep. 106-150; *see also* 65 Fed. Reg. 43,952 (July 14, 2000) (noting that the old Section 81 "was a relic of a paternalistic policy towards Indian tribes prevalent at the end of the nineteenth century"). The result was Public Law No. 106-179, the Indian Tribal Economic Development and Contract Encouragement Act of 2000, which Congress described as "an amendment in the nature of a substitute." S. Rep 106-150 at 8. In short, the 2000 amendments to Section 81 had two purposes:

to clarify the statute's language and to narrow its scope.  To accomplish those purposes, Congress eliminated the "relative to Indian lands" standard and amended Section 81 so that it would apply only to contracts "that encumber[ ] Indian lands."  *See* S. Rep. 106-150 at 9 ("The amendment eliminates the overly-broad [sic] scope of [Section 81] by replacing the phrase 'relative to Indian lands' with the phrase 'encumbering Indian lands.'").  This revised language "allow[s] Indian tribes and their partners to determine with a much greater level of certainty whether Section 81 applies" and "ensure[s] that Indian tribes will be able to engage in a wide array of commercial transactions without having to submit those agreements to the BIA as a precaution."  *Id.* at 9.  Despite a proposal from the executive branch to eliminate Section 81 entirely, Congress decided to "leave[ ] the [amended] provision in place to address a limited number of transactions that could place tribal lands beyond the tribe's ability to control the lands in its role as proprietor."  *Id.*

      Against this background the Court turns to the language of amended Section 81.  The key phrase upon which this case turns, of course, is "encumbers Indian lands."  The word "encumbrance" is a term of art in property law that has a fairly well-defined meaning.  Black's Law Dictionary defines "encumbrance" as: "A claim or liability that is attached to property or some other right and that may lessen its value, such as a lien or mortgage; any property right that is not an ownership interest."  *Black's Law Dictionary* 547 (7th ed. 1999).  A leading treatise on real property states that "[t]he term 'encumbrance' is broader than 'lien' and includes a variety of rights or interests in land (e.g. liens, easements, or restrictive covenants) which may diminish the value of the encumbered property but which are not inconsistent with the transfer of fee simple title."  11 *Thompson on Real Property* § 93.03(a)(2) (2d ed. 1994).  Similarly, under the Uniform Commercial

-14-

Code, "'[e]ncumbrance' means a right, other than an ownership interest, in real property.  The term includes mortgages and other liens on real property."  U.C.C. § 9-102(a)(32).

The DOI's definition of "encumber," contained in the Regulations it passed pursuant to the amended Section 81, is in keeping with the view that an encumbrance is a legal right or interest in real property:

> Encumber means to attach a claim, lien, charge, right of entry or liability to real property (referred to generally as encumbrances).  Encumbrances covered by this part may include leasehold mortgages, easements, and other contracts or agreements that by their terms could give to a third party exclusive or nearly exclusive proprietary control over tribal land.

25 C.F.R. § 84.002.  The commentary gives examples of the types of contracts that do not "encumber Indian lands" under Section 81:

> contracts for personal services; construction contracts; contracts for services performed for tribes on tribal land; and bonds, loans, security interests in personal property, or other financial arrangements that do not and could not involve interests in land.

66 Fed. Reg. at 38,920 (July 26, 2001).  The commentary also provides examples of the types of contracts that may "encumber Indian lands" under Section 81:

> a restrictive covenant or conservation easement may encumber tribal land within the meaning of Section 81, while an agreement that does not restrict all economic use of tribal land may not.  An agreement whereby a tribe agrees not to interfere with the relationship between a tribal entity and a lender, including an agreement not to request cancellation of the lease, may encumber tribal land, depending on the contents of the agreement.  Similarly, a right of entry to recover improvements or fixtures may encumber tribal land, whereas a right of entry to recover personal property may not.

*Id.* at 38,920-21.  The commentary further states that "the terms of the contract or agreement will determine whether the contract or agreement encumber tribal lands."  *Id.* at 38,920.

Thus, under Section 81 and the implementing regulations, a contract that "encumbers Indian lands" is a contract that, by its terms, provides a third party with a legal interest in the land itself; that is, a right or claim attached to the real property that would interfere with the tribe's exclusive proprietary control over the land.

Turning to the language of the Management Agreement, it is clear that the Agreement is not directly concerned with tribal land: nowhere in the Management Agreement is GasPlus given any legal right or interest in the Nambe Pueblo's real property. The Agreement is a straightforward contract regarding the management of NPDC's gasoline distribution business; it does not, by its terms, "encumber" Nambe Pueblo property by giving GasPlus an interest or right attached to the Tribe's lands. Thus, any effect the Management Agreement might have on tribal lands is necessarily incidental or secondary to the Agreement's purpose.

Despite the lack of any express language in the Management Agreement giving GasPlus an interest in Nambe Pueblo real property, the two BIA decisions concluded that it encumbered Indian lands within the meaning of Section 81. Mr. Baracker stated that because the Management Agreement empowered GasPlus "to operate the gas distribution business located on tribal land," it gave GasPlus "nearly exclusive proprietary control over tribal land." A.R. 83. Similarly, Ms. Martin reasoned that because the Management Agreement gave GasPlus nearly exclusive control over the gasoline distribution business, which was located on tribal land, the Agreement encumbered Indian land within the meaning of Section 81. A.R. 393. Defendants succinctly summarized this reasoning in their brief: "Because there are very few restrictions on GasPlus's control of the business under the Agreement, the [BIA] concluded that the Agreement 'encumbers' the land." Defs.' Mem. at 16.

This conclusion does not follow as a matter of law or logic. Nothing in the Management Agreement explicitly or implicitly gave GasPlus a legal right attached to the real property on which the gasoline distribution business was located. The Nambe Pueblo retained all the rights of ownership over both the gasoline distribution business and the land. Had the Tribe wished to mortgage the land (or facilities) during the term of the contract, the Management Agreement would have given GasPlus no power to stop the transaction or place a cloud on the title. The legislative history of the 2000 amendments to Section 81 makes clear that as long as the land itself remains within a tribe's proprietary control, an agreement that merely relates to the land does not require the BIA's approval. *See* S. Rep. 106-150 at 9. The Court cannot agree that the right to manage the day-to-day operations of a business, by itself, is tantamount to an "encumbrance" on the land upon which the business is located.

Ms. Martin's decision provided two bases for her conclusion that control of the business is equivalent to control of the land. First, Ms. Martin focused on the examples contained in the regulations, from which she found a "common thread": that any right "to the *use* of the land" is an encumbrance within Section 81; an ownership interest is not necessary. A.R. 388. Ms. Martin was surely correct that ownership is not the touchstone of Section 81 analysis; a lesser interest in land, such as an easement or lien, is clearly an encumbrance within the statute's meaning. But she was incorrect that *any* use of the land constitutes an encumbrance. Rather, to come within the ambit of Section 81, a third party's right to use tribal land must be in the nature of a legal interest that interferes with a tribe's proprietary control over the land. *See* 25 C.F.R. § 84.002. To this effect, the regulations mention a "restrictive covenant," a "conversion easement," and a "right of entry to recover improvements or fixtures" as examples of "uses" that create encumbrances. 66 Fed. Reg.

at 38,920-21.  The Management Agreement does not give GasPlus the right to "use" the land in this sense.

Second, Ms. Martin relied on a portion of the Senate Report from which she drew the conclusion that a contract giving a third party the right to "operate [a] facility" on Indian land  would necessarily encumber the land.  A.R. 389.  The portion of the Senate Report in question provides an example of a situation in which a third party might acquire proprietary control over a facility on tribal land to the exclusion of an Indian tribe:

> For example, a lender may finance a transaction on an Indian reservation and receive an interest in tribal lands as part of that transaction.  If, for example, one of the remedies for default would allow this interest to ripen into authority *to operate* the facility, this would constitute an adequate encumbrance to bring the contract within Section 81.  By contrast, if the transaction concerned "limited recourse financing" and the lender merely acquired the first right to all of the revenue derived from specified lands for a period of years, this would not constitute a sufficient encumbrance to bring the transaction within Section 81.

S. Rep. 106-150 at 9.  Ms. Martin reasoned that because the Management Agreement gave GasPlus the right "to operate" the gas distribution business, it falls within the example in the Senate Report.  A.R. 389.

The Court finds Ms. Martin's reliance on the Senate Report's example to be misplaced.  First, the example is not a model of clarity — for instance, the reference to "the facility" is unconnected to anything, which makes it difficult to extract any real meaning from the phrase "to operate the facility."  The Court therefore doubts that the two words Ms. Martin seized upon ("to operate") provide a sound basis upon which to conclude that the Management Agreement was subject to Section 81.  In any event, the words "to operate" must be read in context.  In the Senate Report's example, the underlying contract was a loan agreement under which the lender received "an interest in tribal lands" and a remedy for default "that would allow this interest to ripen into authority

to operate the facility." S. Rep. 106-150 at 9. This language must be read in light of the preceding sentence, which states that the amended Section 81 would apply only to "those transactions where the contract between the tribe and a third party could allow that party to exercise exclusive or nearly exclusive proprietary control over the Indian lands." *Id.*

When the entire example is read in context, it is clear that the example is describing a contract very different from the Management Agreement. Unlike the contract in the Senate Report's example, the Management Agreement did not finance a transaction on tribal land and gave GasPlus no "interest in tribal lands as part of the transaction." S. Rep. 106-150 at 9. To be sure, the Management Agreement gave GasPlus limited authority "to operate" the gasoline distribution business, but — unlike the Senate Report's example — that authority did not arise from any interest in the real property. This is a key difference, because the Senate Report makes clear that the ultimate question is whether a contract deprives a tribe of exclusive or nearly exclusive proprietary control over its *land*. Had the Nambe Pueblo defaulted on the Management Agreement, GasPlus — unlike the lender in the Senate Report's example — would have had no recourse against the *land*; its only remedy against the Tribe would have been a breach of contract action and ordinary contract damages. The contract discussed in the Senate Report is therefore significantly different from the Management Agreement.

The Agency's outmoded treatment of the Management Agreement is further illustrated by comparing a case discussed in the Senate Report that involved facts similar to those presented here. In *Wisconsin Winnebago Business Committee v. Kobertstein*, 762 F.2d 613 (7th Cir. 1985), the Winnebago Indian tribe entered into a contract with Ho-Chunk Management Corp., a private company, under which Ho-Chunk would construct and manage a bingo hall on tribal land.

*Id.* at 614-15.  The contract provided that Ho-Chunk would "'operate and maintain the Property' as a tribal bingo hall and [would] control 'all business and affairs in connection with the operation, management and maintenance of the Property.'"  *Id.*  The contract also contained a legal description of the property on which the bingo hall would be located, allowed Ho-Chunk to record the contract "'in any Public Record,'" and prohibited the tribe from causing "'any party to become an encumbrancer of the Property . . . without prior written consent of [Ho-Chunk].'"  *Id.* at 615.  The Seventh Circuit concluded, based on these provisions, that the contract was "relative to Indian land" within the meaning of prior Section 81.  *Id.* at 619.  The Senate Report criticized this conclusion as "inconsistent with the principle that 'The acts of Congress which appear to limit the powers of Indian tribes are not to be unduly extended by doubtful inference.'"  S. Rep. 106-150 at 6 (quoting 55 Interior Dec. 14 (Oct. 25, 1934)).

The Management Agreement is even less related to tribal land than the contract in *Wisconsin Winnebago*.  The Management Agreement gave GasPlus no right to record the contract on the public record or to preclude the Nambe Pueblo from placing an encumbrance on the land.  It merely gave GasPlus the right to manage the day-to-day operations of the gasoline distribution business.  If Congress felt that the contract in *Wisconsin Winnebago* should have fallen beyond the reach of Section 81 before the substitute amendment, then *a fortiori* it would find that the Management Agreement is outside the amended statute's scope.  The BIA ignored Congress's clearly stated intent to move away from the overly broad reading of Section 81, exemplified by cases like *Wisconsin Winnebago*, that had swept within the statute's purview all shape and manner of contracts that had only attenuated ties to tribal lands.  Instead, the BIA applied the old standard as if the statute

had never been amended.  This was a "manifest error in judgment."  *AT&T Corp. v. Fed. Commc'n Comm'n*, 448 F.3d 426, 431 (D.C. Cir. 2006).

Defendants also argue that the BIA's conclusion is supported by the fact that GasPlus derived special benefits from the business's location on Indian land — namely, the special New Mexico tax law pertaining to Indian-owned gasoline distribution facilities.  *See* Defs.' Reply at 10. Thus, Defendants contend that the Management Agreement was "inextricably tied" to the Nambe Pueblo's land.  Defs.' Opp'n to Pl.'s Mot. for Summ. J. at 3.  It is true that courts considered such a benefit to be a factor in determining whether a contract was "relative to Indian lands" under prior Section 81, *see, e.g.*, *Altheimer & Gray v. Sioux Mfg. Corp.*, 983 F.2d 803, 811-12 (7th Cir. 1993), but the Court finds that this reasoning did not survive the 2000 amendments to the statute.  Again, the amendments changed the analytical focus from whether a contract is *related* to Indian lands to whether a contract gives a third party a legal *interest* in tribal lands that encumbers a tribe's ability to control the land as proprietor.  Whether a third party derives some benefit from the fact that a business is located on tribal land, or whether a contract is "tied" to tribal land, is irrelevant; the *sine qua non* of Section 81 analysis is whether the contract *encumbers* Indian land.

Defendants' fallback position is that even assuming the BIA's decision was technically incorrect, it was at least a reasonable interpretation of Section 81 and is therefore immune from reversal under the APA.  Defs.' Reply at 8-10.  Specifically, Defendants argue that the word "'encumber' is an inherently ambiguous term" and that the BIA gave it a broad interpretation because "statutes designed to benefit Indians should be interpreted in their favor." *Id.* at 8, 9.[4]  Thus,

---

[4]  Defendants cite several cases in which courts have found that the word "encumber" is ambiguous.  *See* Defs.' Reply at 8.  The fact that courts have found that word to be ambiguous in other statutes, however, does not mean that the word is ambiguous in Section 81.  In fact, one of the

the BIA construed the word "encumber" to encompass "more than a mere interest in land." *Id.* at 10.

The Court cannot agree that this reasoning is reasonable.  First, the statute and regulations could not be more clear that an encumbrance under Section 81 means a legal interest in *land*.  *See* 25 U.S.C. § 81 ("No agreement or contract with an Indian tribe that encumbers Indian *lands* for a period of 7 or more years shall be valid unless . . . .") (emphasis added); 25 C.F.R. § 84.002 ("Encumber means to attach a claim, lien, charge, right of entry or liability to *real property* (referred to generally as encumbrances).") (emphasis added).  The BIA's conclusion that an encumbrance is broader than a "mere interest in land" finds no support in the statutory text.  Second, by "interpreting 'encumber' broadly," Defs.' Reply at 9, the BIA ignored the fact that Congress fundamentally changed Section 81 by emphatically narrowing its scope to apply only to "a limited number of transactions that could place tribal lands beyond the tribe's ability to control the lands in its role as proprietor," S. Rep. 106-150 at 9; *see also id.* ("The amendment eliminates the overly-broad [sic] scope of [Section 81] by replacing the phrase 'relative to Indian lands' with the phrase 'encumbering Indian lands.'").  The BIA also ignored Congress's instruction that statutes "which appear to limit the powers of Indian tribes are not to be unduly extended by doubtful inferences." *Id.* at 6 (internal quotation marks and footnote omitted).  Third, by going beyond the language of the Management Agreement to find that it encumbered Indian lands, the BIA ignored the Regulations'

---

cases that Defendants cite, *Gobin v. Snohomish County*, 304 F.3d 909, 916 (9th Cir. 2002), found that while there is "inherent ambiguity in the word 'encumbrance' standing alone," the statute in question used the phrase "'encumbrance of land,'" which "necessarily limits the scope of permissible encumbrances [to] [e]ncumbrances with respect to land or encumbrances of the transactions involving land or based on the value of land." *Id.* at 916-17.  Thus, *Gobin* actually contradicts Defendants' argument that "encumbers Indian lands" is ambiguous in Section 81.

instruction that the terms of the contract itself should control the Section 81 analysis.  66 Fed. Reg. at 38,920 ("[T]he terms of the contract or agreement will determine whether the contract or agreement encumber tribal lands.").  Thus, the BIA ignored the plain language of Section 81 as amended, ignored Congress's unambiguous intent to narrow the category of contracts to which Section 81 applies, and ignored the definitions and examples contained in the implementing Regulations.  This was "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).[5]

By its terms, the Management Agreement merely gave GasPlus day-to-day management control over the gasoline distribution business, not a right to exercise proprietary control over the Nambe Pueblo's land.  It thus did not "encumber" Indian land and did not require the BIA's approval under Section 81.

This result is not contrary to the interests of Indian tribes.  Congress has determined that it is in the interest of Indian tribes to be free from bureaucratic oversight of their economic endeavors in all but a narrow category of circumstances.  *See* S. Rep. 106-150 at 9.  That the Nambe Pueblo had a change of heart after entering into a contract with GasPlus and its new leaders sought to avoid the Tribe's voluntarily assumed legal duties is irrelevant to whether Section 81 applies.  Section 81 is not an escape hatch for Indian tribes who enter into unfavorable business arrangements; it is a safeguard that protects Indian lands from being alienated or encumbered by legal claims that

---

[5]  The fundamental flaw in Defendants' reasoning is their belief that Section 81 should be interpreted to benefit Indian tribes and, therefore, that any ambiguity in the statute should be resolved in favor of the Nambe Pueblo.  *See, e.g.*, Defs.' Reply at 9.  Giving Section 81 a broad reading in this case simply because the Nambe Pueblo wish to escape their contractual obligations does not "benefit Indian tribes" as Defendants suggest.  On the contrary, it deprives Indian tribes of the primary benefit that Congress bestowed upon them when it amended Section 81: less Government oversight of their economic activities.

could interfere with Indian tribes' ability to use the land to their benefit.  Indeed, the Senate Report

made clear that, "[c]onsistent with the principles of tribal self-determination, [amended Section 81]

does not direct the BIA to substitute its business judgment over that of a tribal government." *Id.* at

10.  The Nambe Pueblo's government made a business decision to contract with GasPlus to manage

the Tribe's gasoline distribution business, which had nothing more than an attenuated connection

to tribal land.  The BIA's decision to void the contract under Section 81 because the Nambe Pueblo's

government changed its mind about the wisdom of the contract violated the letter and spirit of

Section 81 as amended by the Indian Tribal Economic Development and Contract Encouragement

Act of 2000.  That decision may have benefitted the Nambe Pueblo's immediate litigation interests,

but it did not benefit the economic interests of Indian tribes generally.

## C.     GasPlus's Constitutional and Other Claims.

GasPlus also alleges that its Fifth Amendment due-process rights were violated when

Mr. Baracker declared the Management Agreement null and void without providing GasPlus advance

notice and an opportunity to be heard.  Pl.'s Mem. at 28.  GasPlus argues that this constitutional

violation was "perpetuated" when Ms. Martin affirmed Mr. Baracker's decision.  *Id.*  As Defendants

correctly point out, however, there is essentially no remedy available to GasPlus that could redress

its alleged constitutional injury.  *See* Defs.' Mem. at 20-21.  GasPlus cannot obtain damages, and

there seems to be no equitable remedy that could redress the alleged due-process injury.  Therefore,

GasPlus lacks Article III standing to pursue its due-process claim.  Even if GasPlus had standing,

the Court would decline to entertain GasPlus's constitutional claim based on the doctrine of

prudential mootness, which counsels against deciding novel or complex constitutional questions

when it is uncertain that any equitable remedy will benefit the allegedly injured party.  *See, e.g.*, *Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1019-20 (D.C. Cir. 1991).

The same holds true for GasPlus's claim that the BIA erroneously ordered it to disgorge its profits.  On remand from this Court, the Associate Deputy concluded that Ms. Martin did not have the authority to order disgorgement but her decision was "more in the nature of a demand letter" than an order.  Supp. A.R. 569.  GasPlus contends that Ms. Martin's decision was, in fact, an order, and, even acknowledging the Associate Deputy's decision that disgorgement is not permissible under the statute, Ms. Martin went beyond her authority when she declared the Management Agreement null and void.  *See* Pl.'s Mem. at 26-27.  However, because the Court has already concluded that the BIA erred when it applied Section 81 to the Management Agreement, the issue of the scope of the BIA's remedial powers is effectively moot.

## IV.  CONCLUSION

For the foregoing reasons, the Court will grant GasPlus's motion for summary judgment and will deny Defendants' cross-motion for summary judgment.  The BIA's decision that Section 81 applied to the Management Agreement was not in accordance with law and must, therefore, be set aside.  A memorializing order accompanies this Memorandum Opinion.

DATE: September 6, 2007                    _____/s/_____
                                           ROSEMARY M. COLLYER
                                           United States District Judge